# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-1407

_____

| | | |
|---|---|---|
| Terri Pedroza, | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | |
| David Pedroza, | * | |
| | * | |
| Plaintiff, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Western |
| | * | District of Missouri. |
| Cintas Corporation No. 2, doing | * | |
| business as Cintas Corporation; Cintas | * | |
| Corporation, Sponsor and | * | |
| Administrator of The Cintas | * | |
| Corporation Partner Medical Benefit | * | |
| Plan, | * | |
| | * | |
| Defendants - Appellees. | * | |

_____

Submitted: December 16, 2003
Filed: February 11, 2005

_____

Before MELLOY, BEAM, and COLLOTON, Circuit Judges.

_____

MELLOY, Circuit Judge.

Terri Pedroza appeals the district court's[1] adverse grant of summary judgment on her same-sex sexual discrimination claims under Title VII and the Missouri Human Rights Act. Because she failed to present sufficient evidence to demonstrate a genuine question of material fact as to whether the allegedly discriminatory behavior was based on sex, we affirm the district court's grant of summary judgment on her hostile work environment claim. Consequently, we also affirm the district court's dismissal of her retaliation, constructive discharge, and "punitive damages" claims.

I.

Cintas Corporation ("Cintas") hired Pedroza to work at its Springfield, Missouri facility on July 22, 1998. Cintas promoted her to the position of "team leader" after a few months. Team leader is a nonsupervisory position that involves some direction and coordination of coworkers. She worked initially in the "pants department" but eventually worked in the "shirt hanging department" as well. According to Pedroza's own expert witness psychologist, Pedroza is a "concrete person" who has difficulty understanding the subtleties of non-literal communication such as sarcasm and whose intelligence test scores suggest borderline mental retardation.

The instances of alleged harassment all relate to the actions of one female coworker, another team leader, Pam Straw. As early as 1999, numerous coworkers witnessed arguments between Straw and Pedroza, claimed that there was "friction" between Straw and Pedroza, and claimed that the two women repeatedly "butted heads" and "bickered" with raised voices. In fact, Straw told others that Pedroza was not a good team leader before the first alleged instance of harassment took place.

_____

[1]The Honorable Richard E. Dorr, United States District Judge for the Western District of Missouri.

One coworker reported that Straw said, "Well it would be better if she [Pedroza] knew what she was doing so she could tell the girls how to do it." In addition, when Straw found mistakes in the work of Pedroza's team members, she brought the mistakes directly to the team members rather than to Pedroza, as Pedroza argues would have been appropriate.

According to Pedroza, Straw's harassing behavior began in mid-May 2000 and continued through September 2000, when Pedroza resigned. In mid-May, Straw attempted to hold Pedroza's hand when Pedroza showed pictures of her grandson to Straw. When Pedroza recoiled and asked Straw to stop, Straw said, "You want me to kiss you, honey?" Straw then grabbed Pedroza's face and attempted to kiss her on the mouth. Pedroza jerked away and Straw's wet kiss landed on Pedroza's cheek. Straw then stated, "You love it, honey." Pedroza went immediately to the Springfield Plant Manager, Russ Watkins. Watkins told Pedroza that the behavior was simply Straw's personality.

Pedroza also claims that on a later occasion, Straw approached her and said, "Terri, you're awfully quiet today. Didn't you get a piece of ass last night?" Pedroza responded by telling Straw to "go home to her husband." Straw then told Pedroza that she didn't have a husband and said, "I want you, honey."

In early June 2000, Pedroza asked Straw for assistance on a work-related matter. In response, Straw bent over, pointed her own buttocks at Pedroza, rubbed her own buttocks, and told Pedroza, "Kiss it Terri. You love it." In late June, Straw again grabbed Pedroza's face. Believing that Straw was again attempting to kiss her, Pedroza jerked away. When Pedroza jerked away, Straw ceased her attempt and said, "Kiss my ass." Pedroza reported this incident to her immediate supervisor, Garrett Anderson. Anderson told Pedroza that he would take care of it.

Throughout the summer, Straw repeatedly blew kisses at Pedroza, used foul language around Pedroza, and rubbed her own buttocks while looking at Pedroza. Pedroza complained of this behavior on several weekly reports that she gave to Watkins. Another coworker, Donna Lewis, witnessed much of Straw's behavior and reported this behavior to management on Pedroza's behalf. Lewis reported to Human Resources Director Rhonda Braker that Straw grabbed and tried to kiss Pedroza and that people talked about "which way [Straw] swung."

Pedroza claims that she also reported Straw's actions to Braker and told Braker that "Pam is out there blowing kisses at me and doing all these gestures to me, and it's not professional." Pedroza also claims that when she told Braker Straw's behavior made her uncomfortable, Braker responded, "the boys are already taking care of it." Because Straw's actions continued and Pedroza did not see any management response, Pedroza secretly taped a conversation with Braker. The tape reveals that Pedroza did mention the fact that Straw had been blowing kisses at Pedroza. Braker, however, testified at Pedroza's unemployment hearing that Pedroza did not complain directly to her about Straw and that she learned of Pedroza's complaints through an investigation that Watkins conducted.

Near the end of July, Straw again blew kisses at Pedroza. Pedroza stated, "Pam, don't do that. That is sexual harassment." To which Straw replied, "Write me up. You love it, you know it. Write me up." Near the end of August, Straw asked Pedroza to let Straw temporarily borrow a worker from Pedroza's team. After Pedroza agreed, Straw again grabbed Pedroza's face, and this time, kissed Pedroza on the cheek and said, "I love ya honey." Pedroza reported this incident to Anderson and said that she had to leave work because she simply could not handle the stress over Straw's behavior. Pedroza then left work to use vacation time.

While on vacation, Pedroza received a call from Cliff Smith, the General Manager at the Springfield facility. Smith asked Pedroza to return to work for a

meeting with Braker. At this meeting, which Pedroza secretly recorded, Smith said he did not want to lose Pedroza or Straw, he thought it had all been "blown out of proportion," "we're tired of the friction," and Pedroza needed to be "more open minded to other people's lifestyles."

The team members who worked with Straw and Pedroza suggested that the two switch job duties within the company. Straw and Pedroza did switch positions—a move that involved no change in pay, title, or working conditions and that Pedroza does not allege was a demotion. After the switch, Straw continued to blow kisses at Pedroza, Pedroza reported to Anderson, and when Cintas management did not act, Pedroza resigned.

Pedroza then brought this action against Cintas. She alleged sexual harassment (hostile work environment), retaliation, constructive discharge and religious discrimination (Pedroza is a Jehovah's Witness) under Title VII and the Missouri Human Rights Act. Pedroza also brought a separate claim that she characterized as a claim for punitive damages alleging that Cintas acted with a conscious disregard for her federally protected rights. Pedroza argued that Straw's actions were based on sex because they were gender specific and motivated by homosexual desire. However, when asked in her deposition whether she knew if Straw was a lesbian, Pedroza admitted that she did not know, stating, "I don't know which way she may go. She may want to go both ways. I don't know." After certain evidence was excluded (Pedroza does not appeal any evidentiary rulings), the remaining evidence that Pedroza cited to support her theory that Straw's harassing behavior was motivated by homosexual desire, and therefore based on sex, was (1) the arguably sexual nature of the offensive acts themselves (repeatedly attempting to kiss Pedroza on the mouth or cheek, grabbing Pedroza by the face, stroking Pedroza's hand, and making suggestive comments) and (2) Smith's statement that Pedroza needed to be more open minded about other people's lifestyles. It is undisputed that Straw had five children by a former marriage and was in a long-term, live-in, heterosexual relationship with her

-5-

boyfriend. There was no other evidence regarding Straw's sexual history or preferences.

Cintas moved for summary judgment on all claims. The district court held that there was insufficient evidence to create a question of material fact as to the issue of whether the harassing conduct was based on sex. In addition, the district court found that the harassing conduct was not so pervasive as to constitute a hostile work environment. Finally, the district court found that there was no adverse employment action. Pedroza abandoned her religious discrimination claim during the summary judgment process, and the district court dismissed all of Pedroza's remaining claims. Pedroza appeals.

II.

We review the district court's grant of summary judgment de novo, view the record in a light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor. McCown v. St. John's Health Sys., Inc., 349 F.3d 540, 542 (8th Cir. 2003). Summary judgment is appropriate only where there exist no genuine questions of material fact such that no reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Title VII prohibits an employer from discriminating against an employee based on the employee's sex. 42 U.S.C. § 2000e-2(a)(1). Discrimination based on sex that creates a hostile working environment violates Title VII. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) ("When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated.") (internal citations and quotation marks omitted). To state a prima facie case for a claim of sexual discrimination based on a hostile work

environment, an employee must show: (a) she belongs to a protected group; (b) she was subject to unwelcome sexual harassment; (c) the harassment was based on sex; (d) the harassment affected a term, condition, or privilege of employment; and (e) her employer knew or should have known of the harassment and failed to take proper remedial action. McCown, 349 F.3d at 542. In the present case, we address the third requirement, whether the harassment was based on sex.

The based on sex requirement forces a plaintiff to prove that she was the target of harassment because of her sex and that the offensive behavior was not merely non-actionable, vulgar behavior. This distinction exists because "Title VII does not prohibit all verbal or physical harassment in the workplace" and is not "a general civility code for the American workplace." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998) (recognizing a claim for same-sex harassment that created a hostile work environment where the alleged harassment forced an oil platform worker in the Gulf of Mexico to quit his job out of a fear of same-sex rape). Consequently, to succeed on a hostile work environment claim under Title VII, a plaintiff must show "that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimina[tion] . . . because of . . . sex." Id. at 81 (quoting 42 U.S.C. § 2000e-2(a)(1)).

As we recognized in McCown, the Supreme Court set forth a non-exhaustive list that included three possible evidentiary routes same-sex harassment plaintiffs may follow to show that harassment was based on sex:

> First, a plaintiff can show that the conduct was motivated by sexual desire. Second, a plaintiff can show that the harasser was motivated by a general hostility to the presence of the same gender in the workplace. And third, a plaintiff may offer direct comparative evidence about how the harasser treated both males and females in a mixed-sex workplace.

McCown, 349 F.3d at 543 (citing Oncale, 532 U.S. at 80-81). Here, the second and third methods are not applicable. The relevant workplace appears to have been exclusively female, and, at any rate, Pedroza offers no comparative evidence regarding the treatment of males at Cintas. Further, Pedroza concedes that Straw was not generally hostile towards other women in the workplace.

What remains is the question of whether, based on the summary judgment record taken in a light most favorable to Pedroza, any reasonable jury could find that sexual desire motivated Straw's actions towards Pedroza. Pedroza points to the facts that one coworker suggested "people" questioned "which way [Straw] swung" and General Manager Smith told Pedroza to be more open to other people's lifestyles. We may not consider the comments or rumors from non-management coworkers regarding Straw's sexual orientation because the district court granted Cintas's motion in limine to exclude these comments, and Pedroza does not contest that ruling. We also refuse to consider Smith's comment because, although the district court file contained a transcript of the recorded conversation in which Smith made the "lifestyle" comment, Pedroza did not bring this statement to the attention of the district court in her brief in opposition to Cintas's summary judgment motion or in any counter statement of the facts before the district court. See Crossley v. Georgia-Pacific Corp., 355 F.3d 1112, 1114 (8th Cir. 2004) (noting the burden on a party resisting summary judgment to designate the specific facts that create the triable question of fact); Jaurequi v. Carter Mfg., Co., 173 F.3d 1076, 1085 (8th Cir. 1999) ("[A] district court is not 'obligated to wade through and search the entire record for some specific facts which might support the nonmoving party's claim.'") (internal citation omitted).

Pedroza therefore must rely solely on the nature of Straw's harassing actions themselves—grabbing Pedroza's face and attempting to kiss her on the mouth and cheek, attempting to hold Pedroza's hand, pointing to her own buttocks and telling Pedroza to "kiss it," saying to Pedroza "kiss my ass" when Pedroza asked for help,

blowing kisses at Pedroza, and saying that she didn't have a husband and that she wanted Pedroza—as evidence that sexual desire motivated Straw's behavior.

Cintas, on the other hand, notes that it was undisputed that Straw had five children from a former marriage; Straw was in a long-term, live-in, heterosexual relationship with her boyfriend; Straw and Pedroza had a generally antagonistic relationship with each other that preceded any allegedly harassing conduct; and, according to Pedroza's own expert, Pedroza was a "concrete person" of limited intelligence who had difficulty understanding sarcasm and who tended to take statements literally. Pedroza asks us to conclude that a jury question exists as to whether sexual desire motivated Straw's behavior. Cintas asks us to conclude that the evidence permits only one reasonable interpretation, namely, that Straw was a vulgar and boorish coworker who sought to antagonize Pedroza and that Pedroza misunderstood and misinterpreted Straw's actions.[2]

To buttress its argument, Cintas points to a line of cases from this and other circuits wherein courts found that instances of alleged same-sex harassment were not "based on sex" but rather, were vulgar and boorish behavior that was "tinged with offensive sexual connotations" but not suggestive of motivation by sexual desire. See McCown, 349 F.3d at 541-43 (finding that harassment was not motivated by sexual desire where the victim suggested the harasser was "just trying to 'irritate' him," and the harasser grabbed the victim on the waist, chest, and buttocks, pressed against the victim in simulated intercourse, and attempted to put objects in the victim's buttocks); Linville v. Sears, Roebuck & Co., 335 F.3d 822, 823-24 (8th Cir. 2003) (finding harassment not based on sex where the harasser repeatedly struck the

---

[2]We disagree with Straw regarding the inferences that may flow from the facts that she had children and had been in a long-term relationship with a man. These facts tend to prove only that Straw was not strictly homosexual. They do not preclude a jury from finding that Straw was motivated by some degree of homosexual desire towards Pedroza. It would be naive and artificial for us to conclude otherwise.

victim in the scrotum); Davis v. Coastal Int'l Sec., Inc., 275 F.3d 1119, 1125 (D.C. Cir. 2002) (finding that harassment was not based on sex where two harassers had a pre-existing antagonistic relationship with the victim and repeatedly grabbed their own crotches, made kissing gestures, and described oral sex towards the victim); Johnson v. Hondo, Inc., 125 F.3d 408, 410-12 (7th Cir. 1997) (finding that harassment was not based on sex where the harasser repeatedly brushed against the victim, grabbed and manipulated his own crotch in front of the victim, and repeatedly described oral sex towards the victim). The Seventh Circuit in Johnson explained the reasoning that supported this line of cases:

> Most unfortunately, expressions such as . . . "kiss my ass," and "suck my dick," are commonplace in certain circles, and more often than not, when these expressions are used (particularly when uttered by men speaking to other men), their use has no connection whatsoever with the sexual acts to which they make reference-even when they are accompanied, as they sometimes were here, with a crotch-grabbing gesture. Ordinarily, they are simply expressions of animosity or juvenile provocation[.]"

Johnson, 125 F.3d at 412. Straw urges us to hold as a matter of law that Pedroza's actions are analogous to the harassers' actions in the above cases and that no reasonable jury could infer homosexual desire from Straw's actions.

Pedroza counters that, because this case involves allegations of same-sex harassment between females rather than same-sex harassment between males, we must not compare the facts of this case to the above cases that involved only male, same-sex harassment. Instead, she argues, we must apply a different standard in the context of female same-sex harassment to find the line that separates permissible albeit unpleasant and vulgar behavior from prohibited behavior that is based on sex. Pedroza points to cases such as Johnson in which the court specifically noted the common use of vulgar expressions in the workplace "particularly when uttered by

-10-

men speaking to other men." Id. Pedroza concludes that, because such bawdy, "locker room" behavior is not as commonplace among females, a reasonable jury could more readily infer actual sexual desire based on similar statements or acts by females, and, accordingly, we should be more hesitant to grant summary judgment in a case that involves female same-sex harassment.

On this specific point, we disagree with Pedroza. First, we do not find it appropriate in the context of Title VII to establish dual standards for the "based on sex" showing required in male and female same-sex harassment cases. Further, even if we were inclined to draw such a distinction, Pedroza offers nothing but her own unsupported opinions as to the prevalence of vulgar language and behavior in female dominated workplaces. Accordingly, we reject Pedroza's argument that we cannot look to cases that involve male same-sex harassment to determine whether a female, same-sex harassment plaintiff has made the showing required to create a jury question under the based on sex requirement.

Looking at the entirety of the evidence *that we may consider*, and comparing the facts of this case to the developing body of authority under the "based on sex" analysis in same sex harassment cases, we believe the district court correctly determined that the evidence to suggest motivation by homosexual desire was insufficient to create a triable question of fact. Accordingly, Pedroza's hostile work environment claim fails.

Pedroza raises no separate arguments based on state law, and we hold that Pedroza's retaliation and constructive discharge claims fail for the same reason as her hostile work environment claim. Pedroza's retaliation and constructive discharge claims also fail due to the absence of an adverse employment action. Pedroza voluntarily switched positions after Straw and Pedroza's coworkers suggested the switch. There was no diminution in pay or benefits, and working conditions did not change in a manner that we may characterize as adverse. Pedroza argues that she was

unfairly criticized after the switch, but criticism in a new position is to be expected. Finally, regarding Pedroza's separate claim for punitive damages, even if we had found that her underlying claims survived summary judgment, there is nothing that would justify our placing the present case in the "narrow class of cases" where the employer acts "with malice or reckless indifference" to the federally protected rights of its employees. Lawrence v. CNF Transp., Inc., 340 F.3d 486, 495 (8th Cir. 2003). Here, the undisputed evidence shows that Cintas management attempted to curtail Straw's actions. As such, even if Pedroza had ultimately prevailed, an award of punitive damages would not be appropriate.

We affirm the judgment of the district court.

COLLOTON, Circuit Judge, concurring.

I concur in the opinion of the court, with a brief clarification concerning footnote 2. I agree that the facts that Straw had children and had been in a long-term relationship with a man "do not preclude a jury from finding that Straw was motivated by some degree of sexual desire towards Pedroza," *ante*, at 9 n.2, but I think it is an overstatement to say that "[t]hese facts tend to prove only that Straw was not strictly homosexual." *Id*. A long-term heterosexual relationship is *relevant* to whether Straw acted out of homosexual desire – that is, it has a "tendency" to make the existence of homosexual desire less probable than if, say, Straw had been in a long-term homosexual relationship, *see* Fed. R. Evid. 401 – but it is by no means conclusive on the point. I thus agree that Cintas's argument in favor of summary judgment on this basis should be rejected.

_____

-12-